**In re James R. MULLICAN, Kathleen V. Mullican, Debtors.**

**Kathleen MILLER, Plaintiff,**

**v.**

**James R. MULLICAN, and Leonard P. Goldberger, Trustee, Defendants.**

**Bankruptcy No. 81–04779G.**
**Adv. No. 82–1558G.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 1, 1982.

Charles S. Silver, Naftulin & Silver, Doylestown, Pa., for plaintiff, Kathleen Miller.

Mitchell Miller, Jack K. Miller, The Bankruptcy Clinic, Inc., Philadelphia, Pa., for debtor/defendant, James R. Mullican.

Leonard P. Goldberger, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., trustee.

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

The matter in dispute in this case arises out of a complaint filed by one Kathleen Miller ("Miller") seeking to have a debt owed to her by the husband-debtor ("Mullican") determined to be nondischargeable. We conclude that the debt was created by the husband-debtor, while acting in a fiduciary capacity, and is, therefore, nondischargeable.

The facts are as follows:[1] Miller, who was a friend of Mullican and Mullican's wife, told them she was having marital problems with her husband, with whom she maintained a joint bank account. Mullican suggested that this was tactically unwise for Miller and recommended that Miller hasten to draw the moneys out of said account, lest her husband do so first. Concluding that this was good advice, Miller went to the bank accompanied by Mullican's wife, withdrew $5300.00, and returned to the Mullican household. There she asked Mullican what she should do with the money. According to Miller, Mullican suggested that she give it to him for safekeeping, promising to return it to her on demand.

Mullican's story of the circumstances and conditions under which he came into possession of the money is, to put it mildly, somewhat different. He concedes that, when asked by Miller what she should do with the money, he suggested that she give it to him to hold for her until she would need it. But then, he says, Miller suggested that he use the money to buy some marijuana (wholesale of course), which they would then sell (retail, of course) and they would split the profits. Mullican's wife, who says she was present throughout this entire conversation, corroborated her husband's testimony, as did some man who says he was sitting on the porch of Mullican's home, minding his own business, when he was called inside to witness the transaction. "I was sitting on the porch [he testified] when Kathy (Miller) came over and Jimmy Mullican called me into the house. We sat down at the table and Kathy got a stack of bills out ... and then she gave it to Jimmy and said I trust you with this money and to use it to make money for her and Kathy asked how are we going to make it and Jimmy and Kathy had talked about buying pot to get some extra money." Asked why he was called in, he responded, "That I couldn't tell you. He didn't say anything about that" (N.T. p. 53 et seq. 10/14/82). This concluded his connection with the matter so he "went back on the porch and finished my beer" (N.T. p. 54, 10/14/82).

In any event, Mullican agrees that he never bought a grain of marijuana with Miller's money. He claims that he couldn't locate his purchasing connection. So, being unemployed, he says he used the money to live on. Miller went to the District Attorney of Bucks County and caused a warrant

---

[1]. This opinion constitutes the findings of fact and conclusions of law required by Rule 752 of the Rules of Bankruptcy Procedure.

for Mullican's arrest to be issued, charging him with "theft by deception and a number of other things" (N.T. p. 61, 10/14/82). To avoid trial, Mullican executed and delivered to Miller a judgment note for the balance of $4500.00 which he owed her. (He had paid her $800.00.) He still owes $4500.00 to her and the question is whether that debt is dischargeable.

We disbelieve the testimony of Mullican, his wife, and the witness who was minding his business on the porch and who was, it was testified, called into the house to witness the monetary transaction between the parties. On the contrary, we believe Miller and, believing her, conclude that the money was obtained by Mullican by "fraud or defalcation while acting in a fiduciary capacity" and was therefore nondischargeable under § 523(a)(4).

We conclude that the funds given to Mullican were to be held by him in trust.[2] As such it is not necessary to prove an intentional wrong by him. Suffice that, acting in a fiduciary capacity, he committed a defalcation by failing to return all of Miller's money: *In re Byrd*, 15 B.R. 154, 156 (Va. 1981); *Matter of Polidoro*, 12 B.R. 867 (N.D. 1981); *In re Kanczynski*, 442 F.Supp. 413 (W.D.N.Y.1977).

Accordingly, we determine that the balance of the moneys given to Mullican, amounting to $4500.00, were to be held by him in trust for Miller. Since he admits that he spent the money "to live on," he committed a defalcation of the funds and the debt is nondischargeable.

---

**2.** Section 523(a)(4) provides that a debt is nondischargeable if it arose from

(4) . . . fraud or defalcation while acting in a fiduciary capacity.